## BANK OF NEWBURY *v.* EASTMAN.

Where a party claims title by the extent of an execution in his favor, made within thirty days after the rendition of his judgment, upon land attached on his original writ, copies of the writ, return of service, judgment, execution and return of the extent, are admissible for him in evidence of such title.

The acceptance of seizin of land, levied on for a bank, by its cashier, whose act is afterward ratified by the bank, is a sufficient acceptance of seizin by the bank.

Where an unrecorded deed had been re-delivered by the grantee to the grantor, who received it without any intent to revest the title in the grantor to his own use, but merely that another deed might be substituted, and no rights of third parties had intervened, and proof of the first deed would not defeat or impair any right intended to be given to the grantor by such surrender; — *Held*, that the grantee was not estopped to show the first deed.

Open, visible and exclusive possession by the grantee of premises conveyed to him by an unrecorded deed, is notice of his deed.

The plaintiff, having recovered a judgment against C, caused his execution, within thirty days thereafter, to be extended on land of C, attached on the original writ;— *Held,* that the defendant, claiming the land by a deed from C subsequent to the attachment, was concluded by the sheriff's return on the execution, that the appraisers were disinterested.

The court, where the parties have so agreed, may set aside a verdict in part.

THIS is a real action, to recover a tract of land in Whitefield, in this county. The defendant pleaded the general issue, with a brief statement of a claim for betterments. The writ is dated April 7, 1860, and was served April 9, 1860.

It was admitted that the land in question was the property of Morris Clark, and both parties derive their titles from him; the plaintiffs under a levy of execution, the defendant under deeds from him. To prove their title, the plaintiffs introduced an office copy of a writ of attachment in their favor against said Clark and others, dated November 14, 1853, founded on several promissory notes, and returnable May term, 1854, on which there was a return by an officer of this county, as follows: Coös ss. November 17, 1853. I then attached, as the estate of the within named Morris Clark, the house and other buildings, in which he now lives, in Whitefield, in said county, and all other real estate he owns in said town, and all right in equity he has to redeem the same (then follows an attachment of lumber), by leaving an attested copy of this writ, and of this my return thereon, at the dwelling-house of I. S. M. Gove, town-clerk of said town, at sixteen minutes before three of the clock in the forenoon of said day. To the admission of this and other copies of single papers the defendant objected, on the ground that copies should be produced, certified as true copies of the whole record, and papers filed in the case; and on its admission took an exception.

They then produced an office copy of a judgment, rendered in their favor against said Clark and others, at the April term, 1859 (April 25, 1859), for $5,893.42 debt, and $31.35 cost, which referred to the declaration, as set forth in the writ on file, but they were certified to be copies in the same case.

They then produced a like copy of a writ of execution, reciting the same judgment, dated April 28, 1859, and of a levy made upon it; by which it appeared that Aurin M. Chase was sworn as an appraiser, May 2, 1859, Joel B. McGregory, May 3, and again May 17, and Ralph Fisk, May 25, 1859. The certificate of the appraisers was dated July 13, 1859, and states the value of the lands in question at $1050, and no more.

The officer's return is dated July 13, 1859, and sets forth, among other things, in the usual form, "I caused three appraisers to be appointed, that is to say, Ralph Fisk by the creditor within named, Joel McGregory by Morris Clark, one of the debtors within named, and the owner of said property, Aurin M. Chase by myself; the said Ralph Fisk, Joel McGregory and Aurin M. Chase being all discreet and disinterested men, resident in the county," &c.

The acknowledgment of the receipt of seizin of the same date is signed thus: "The president, directors and company of the bank of Newbury, by George Leslie, cashier." The defendant objected

that the cashier of the bank had no authority *ex officio* to receive seizin of land set off on execution, and excepted, when the objection was overruled.

The defendants proposed to show that the debt for which judgment was rendered against Clark and others, was a debt of the White Mountains Railroad, and that Chase and McGregory, two of the appraisers in making the levy, were stockholders of that railroad, and not disinterested persons. The plaintiffs objected that the return is conclusive on this point.

The books of the railroad corporation were offered to prove payments made by A. M. Chase and J. McGregory, on account of shares held by them in the White Mountains Railroad corporation, and to prove that the notes upon which the plaintiffs' judgment was rendered were given for debts of the corporation. Objection was made that the books of the corporation are not evidence between these parties of either of those facts : That it is immaterial whether they were stockholders or not; and that if they were stockholders no individual liability for debts of the corporation is shown, and the evidence is therefore immaterial.

Morris Clark was a witness. He testified that at the organization of the White Mountains Railroad he was elected one of the directors, and has so continued since. His real estate was set off on execution, founded on his note. Objection was made to parol evidence of these facts, and exceptions taken upon its admission. He signed the notes as one of the directors, and the other directors signed them. They were given for a debt of the railroad company. The corporation was not a signer of the note. It was a joint and several note, signed by the directors, but the corporation had the money. Office copies of the notes were produced, which agreed with Mr. Clark's account, and with that shown on the company books.

Joel McGregory was a witness. He testified that he signed for two shares in the White Mountains Railroad. Objection was made that such signature could not be proved by parol, and exception was taken, when it was admitted. He testified that he made payments on two shares to the amount of $200; he thinks the first payment about 1853; all before 1859. He attended two meetings of the corporation, one five or six years ago, the other a year ago, but took no part. He has taken no certificate of shares, has asked for none, and had none offered him. He does not recollect that he was asked if he was a stockholder, or if he denied that he was, when appointed an appraiser of M. Clark's estate.

Morrill Aldrich, a witness for the defendant, testified : In the spring of 1853, the last of March or the first days of April, I applied to Lorenzo D. Parker to purchase his house and land, part of the premises in question, and after some talk purchased them for $650. There was a house covered, shingled, clapboarded and painted outside, with one or two rooms plastered and painted once, and a shed annexed. Parker was in the occupation of the house, and I think had been for about a year, but can not tell the time. Parker told me he had only a bond for a deed. When we agreed

upon a price I think he and I went to Mr. Clark. We thought it a shorter way to take a deed from Clark to me, and I took a deed from him. Part of the price I paid down to Clark and part to Parker. I can not tell the amount I paid Parker, but think it was about $100. I gave my note to Clark for the balance, and he gave me a deed. This note I paid in about thirty days afterward. A paper being shown to the witness, he said it is the same deed I received of Clark. Objection was made to this instrument because it is not recorded, and because the name of the grantor has been canceled. The objection was overruled, and the plaintiff excepted.

The witness then said, I took the deed and carried it home with me. I can not tell how long I kept it. I had not land enough to set the barn where I wished. I went to Clark and purchased of him twenty-two square rods more. I told Clark I would not put the deed I had on record; I would have it all in one deed. This bargain as to the twenty-two rods was soon after the first deed. Another instrument was shown to the witness, dated April 18, 1854. The witness said this is the other deed I took. The reason of the delay was to get Mr. Gove to survey it. Mr. Gove was register of deeds at Lancaster, and only occasionally at Whitefield, and it was nearly a year before the survey was made. The first deed was in my possession till the second was executed, when I gave it up to Mr. Clark, and I suppose he canceled it. The second deed contains all the land included in the first, and the twenty-two square rods. When Parker purchased the land it had no improvements upon it. I think he went into possession about a year before I purchased, and continued in possession till he sold to me. After I purchased, Mr. Eastman, the defendant, went into possession. It was fixed up in a hurry, and he moved in with his family, a wife and child, and remained in possession about two years after I took the deed. I did some joiner work, plastered what was not plastered, painted the inside, and papered it, put blinds on, built a piazza in front, built a small barn about 24 feet, and painted the outside of the buildings. I kept an account of what I laid out, amounting to $402, including my own time. I made all these improvements the season I purchased, I think. Mr. Eastman was there over a year and a half, and not quite two years, and I then rented the property to Mr. Safford. He lived in it one and a half year, and I then sold it to the defendant pretty low, because I wanted to get him to preach there. The price was $900.

M. Clark's bond to Parker being shown to the witness, he says, I can not say whether or not I saw the bond. I do not recollect I took it in hand, or that I saw Parker's notes. I agreed to pay $650 for the property, and paid Clark $15 for the twenty-two rods.

The bond of Clark to Parker was read; it was dated July 1, 1852; the penalty was $800, conditioned on payment of $483.77; $33.77 first of July in shingles, the balance in nine annual payments of $50 each, to make a good title to the land in question.

Witness said, I think I paid Parker his money at Clark's—can not tell if Parker left his bond at Clark's, when he got his pay of me. All I had to do with Clark was to take a deed from him. I

do not know if I saw the bond. I think I paid Clark all but about $100. My deed was dated the day I took it. I can not tell if my note to Clark was $250 or $300. I retained the first deed till I took the other. I gave it to Clark. I did not cancel it. I took the new deed to include the whole. I changed deeds with Clark, and supposed he had a right to do as he pleased with the first deed. I took no conveyance from Parker. All the deed I had was from Clark. I know nothing of the settlement or arrangement between Clark and Parker. I do not know whether Clark was anxious to bring about a sale or not. I thought the first deed was not minute enough, and wanted the land run out, and to have it all in one deed, as there was another deed to be made. Mr. Eastman went in under me in three or four weeks after I bought. He claimed no title, and he was in possession when the attachment was made. I made no examination of the records, and I did not know Clark was sued. Mr. Gove, the town-clerk, lived in the village, half a mile from me. I paid $125 for the barn, the piazza and painting. The paint and paper were in good condition the last time I was in the house. I supposed my title good. I never doubted it. I think the first I knew of the attachment was about the time the land was set off, not six months before. I knew Clark was sued about the time I got my deed recorded, which was July 10, 1856. I then knew his estate was attached. I did not know when or what. Clark's deed to me was a warrantee deed, and I gave a warrantee deed to Mr. Eastman. I did not know of the attachment at the time.

Mr. Clark being recalled, testified: In March, 1852, I sold Parker a piece of land, to build a house on, for $100. He paid me $55, a watch called $30, and $25 in money. He was to pay the balance in making shingles. He gave a writing, or security. I made a charge on my books, and gave him credit for what he paid. Parker built a house and wood-shed on the land, not finished, but covered and glazed, and two or three rooms finished, so that he lived in them. He fixed it up so as to live in it very soon. I sold him a good deal of lumber, and took a job of him to build the cellar. I charged these on my book. They were not secured. I gave Parker no deed, but I gave him a bond for a deed. It was but a few weeks after I sold to Parker before he commenced building. I think the labor and materials I furnished him amounted to $400 or $450. The last of March, 1853, Parker sold to Aldrich, and I deeded to him. They came to me and told me that Parker had sold. I had nothing to do with the trade. I gave a deed to Aldrich, settled with Parker, and took up my bond. I do not recollect the time I gave bond to Parker. It was after he had done much of his improvement. I gave Aldrich a second deed, the same shown here. I sold him a second piece of land, and he wished all put in one deed. I understood there was a survey. I was not present when the second deed was made. It was brought to me. I think the second piece was twenty-two rods. I supposed I had $10,000 or $15,000 of property. I was liable to pay to a large amount; not $100,000, I think. They were liabilities incurred for the railroad; not all before my deed to Aldrich. I signed for new liabilities after

that, double or treble all I had. All my property was attached. Not a dollar of mortgage on any of it, till after the attachments. Some of it was mortgaged the next day. I mortgaged a good deal in 1853; not all. I suppose a good many knew of the attachments and mortgages. I think Parker said he had $100 he could turn toward his building. I furnished material and labor about $400 or $450; think I paid for labor about $100. I supposed I could hold the land till I gave him some title to it. I think Parker was owing me $550 when I deeded to Aldrich. I do not recollect advising Parker to sell. I took the bond of Parker when I settled; do not know Aldrich ever had it, and do not know Parker ever conveyed his interest to Aldrich by any writing. I settled with Parker and took up my bond, March 25, 1853. I received my pay March 22d, the day I deeded to Aldrich. I am not certain when the bond was given up. Aldrich paid me the money and gave me his notes. It was not paid to Parker. When this suit was commenced I looked and found the bond and first deed among my papers. I presume I canceled the names when the new deed was made. I do not recollect I told Aldrich the land was attached. I said nothing of it. By my book, the amount of material and labor furnished to Parker was $577.46, from which nearly $100 credit is to be deducted.

The defendant put in evidence the deeds, namely, M. Clark to M. Aldrich, dated March 22, 1853, not recorded, and canceled; to which the plaintiffs objected, as no evidence of title. M. Clark to M. Aldrich, dated April 18, 1854, recorded July 10, 1856. M. Aldrich to Wm. H. Eastman, dated April 21, 1856, recorded December 2, 1858.

Wm. H. Eastman, the defendant, testified: I went into possession of these premises under Aldrich the last days of April, 1853, and was in possession under him one year and about seven months. The house was unfinished, two rooms plastered, painted and papered below; in chambers nothing done. The chambers were partitioned, floored, lathed, plastered, painted and papered, two rooms finished, lathed and plastered, not papered below, and a room and pantry in the ell, where the wood-shed is, and a barn builded, twenty by twenty-four feet, since I bought. I put an addition to the barn, which is on the twenty-two rod piece. The land has been fenced. April 21, 1856, I bought of Aldrich; that is the date of my deed. My improvements amount to $75 or $80. I supposed I had a good title. I have not paid Mr. Clark for the last piece I bought of him, because I thought it was attached. There was to be no payment unless I held the land. I gave him a note for $100. He said his affairs were unsettled; he did not care to have the money till his affairs were straightened out. I do not recollect he told me of any attachments upon his property; he might; I do not recollect it. My deed from Mr. Clark was dated April 21, 1856, and a deed of Aldrich to me was of the same date. I did not examine the records. I considered Aldrich good. I moved in soon after the date of Clark's deed to Aldrich. The place was procured for a parsonage. I was expected to occupy it. I paid Aldrich soon after I had a deed from him — within a year or two of the purchase. I have repaired and repapered some of the house. The house is in good

condition.   I think Aldrich got $70 rent while I occupied first, paid by the society.

Aurin M. Chase testified: I made payment on one share in the White Mountains Railroad assessments; I think $90 or $95; the first payment immediately after they commenced making assessments, eight, ten, or more years ago.   I was present, acted, and voted at several meetings; have had no certificate of shares.   Do not know I ever claimed to be a stockholder.   I understood the shares were $100 each.   I was induced to subscribe under an assurance that there should be no personal liability.   When that vote was rescinded I declined to do any thing further.   The meetings I attended were before that vote.

Similar exceptions were taken to this evidence as were taken in the case of McGregory.   Upon this evidence the defendant contended that the levy upon the whole property was insufficient, because two of the appraisers were not disinterested persons, and that as to the property first conveyed to M. Aldrich, the defendant's title was good from an earlier date than the date of the attachment under which the plaintiffs now claim; and that if not, he is entitled to the increased value of the property, by reason of the improvements made thereon by himself and those under whom he claims, as set forth in his brief statement.   And thereupon a verdict was taken, by consent, for the plaintiff, subject to be set aside in whole or in part, as the opinion of the court shall be upon the foregoing case.   The verdict returned was as follows:

Coos ss.   Supreme Judicial Court, April term, 1862.   *Bank of Newbury* v. *Wm. H. Eastman.*   As to so much of the demanded premises as is bounded beginning on the highway at the corner of the board fence on the southeast line of said premises; thence, by said highway, north sixty-five degrees west, eight rods; thence north twenty-five and a half degrees east, four rods seventeen links; thence south sixty-five and a half degrees east, two rods sixteen links; thence twenty-three degrees east, eleven and a half rods; thence south twelve and a half degrees east, two rods seven links; thence about sixty-five degrees east, to the easterly corner of the before mentioned board fence, five rods thirteen links; thence by said board fence to the place of beginning; the jury find that the said Eastman did disseize the plaintiffs in manner and form as they have alleged.

And as to the residue of the demanded premises the jury find that the said Eastman did disseize the plaintiff in manner and form as they have alleged; and as to this portion of said premises they find that the said Eastman, and the persons under whom he claims, have been in the actual peaceable possession thereof, under a supposed legal title, for more than six years before the action was commenced, and that the value thereof has been increased by them, by buildings and other improvements, and that the amount of the increased value thereof, after allowing for any waste, or injury the same may have sustained, is the sum of nine hundred dollars.

RUSSELL GAMSBY, Foreman.

The first described tract in said verdict comprises the land pur-

chased by Eastman of Clark, April 21, 1856, and the second parcel, of twenty-two square rods, purchased by M. Aldrich of said Clark, April 18, 1854. The second described tract, the residue mentioned in said verdict, contains the land which M. Clark gave a bond to convey to Lorenzo D. Parker, dated July 1, 1852, and of which he made a deed to M. Aldrich, March 22, 1853.

*Farr*, and *H. & G. A. Bingham*, for the plaintiffs.

*Cossitt*, and *Burns & Fletcher*, for the defendant.

BARTLETT, J. The copies of the judgment, execution and return of the extent were properly received to show the plaintiff's title, and the copy of the writ and return of service to show the fact and date of the attachment. *Packard* v. *Hill*, 7 Cow. 434; *Rathbone* v. *Rathbone*, 10 Pick. 1. We need not inquire whether, if the case had required the production of the whole record, these copies would have been sufficient. See *United States* v. *Wood*, 2 Wheel. Cr. C. 326, cited in 2 C. & H.'s Notes, Phill. Ev. 318. Whether the cashier had, by virtue of his office, authority to receive seizin for the bank or not (See Ang. & Am. Corp. 297; Story Agency, sec. 114; *Corser* v. *Paul*, 41 N. H. 24); there is sufficient evidence of a ratification of his act by the bank. *Pratt* v. *Putnam*, 13 Mass. 363; *Smith* v. *Smith*, 11 N. H. 462; *Herring* v. *Polly*, 8 Mass. 119; *Odiorne* v. *Mason*, 9 N. H. 29.

It is well settled that the re-delivery of an unrecorded deed for cancelation, to the grantor by the grantee, does not operate as a re-conveyance, but it will, under certain circumstances, estop the grantee from making proof of the deed so delivered up. However, the destruction of a deed by a party does not in all cases preclude him from showing its contents. *Riggs* v. *Taylor*, 9 Wheat. 483; 2 C. & H.'s Notes, Phill. Ev. 406. Where an unrecorded deed has been canceled or re-delivered to the grantor by the grantee, with the intention of revesting the title, the grantee can not "produce the deed, and the law will estop him in both cases to give secondary evidence to defeat the intended operation of his act in returning or annulling the deed." *Mussey* v. *Holt*, 24 N. H. 252; *Farrar* v. *Farrar*, 4 N. H. 195; *Dodge* v. *Dodge*, 33 N. H. 495. Here the deed was re-delivered, not with the intent that the land should become the grantor's, but merely that another deed might be substituted. The intention was not to revest the title in Clark to his own use, but only, if at all, that it might at the same instant enure to the benefit of Aldrich, by virtue of the deed then or already executed to him. See *Crocker* v. *Pierce*, 31 Me. 177; *Hall* v. *McDuff*, 24 Me. 312. The good faith of this transaction is not impeached, the rights of third parties have not intervened (*Palmer* v. *Jenness*, Rockingham, December term, 1862), and proof of the first deed in the present case would not defeat or impair any right intended to be given to Clark by the surrender. See *Lawrence* v. *Lawrence*, 42 N. H. 112. As there was no estoppel to show the deed, proof of it was properly admitted, and it showed title in Aldrich from its date, as against

all having notice of it.  All the evidence upon the point tends to show that before and at the date of the attachment, Aldrich, by his tenant, had open, visible and exclusive possession of the premises embraced in it.  There is no conflicting evidence, and nothing to show that any question was made as to the credibility of the testimony; still the jury might have disbelieved the witnesses, and it may be that a verdict, by consent, would not be disturbed, if this were all.  But the case, after stating this with other uncontradicted testimony at length, says, "upon this evidence the defendant contended that the levy upon the whole property was insufficient, because two of the appraisers were not disinterested persons; and that as to the property first conveyed to Mr. Aldrich, the defendant's title was good from an earlier date than the attachment under which the plaintiffs now claim, and that, if not, he is entitled to the increased value, &c.  And thereupon a verdict was taken, by consent, for the plaintiffs," &c.  The ruling of the court upon these positions of the defendant is not stated, but looking at these facts and also at the verdict, which is for the whole premises, allowing the defendant for betterments on the tract first conveyed, we understand that the court, in substance, ruled that the whole premises passed by the extent, but that the defendant was entitled to his betterments upon the tract first conveyed.  But if, before and at the date of the attachment, Aldrich was in such possession of this tract as the evidence tended to show, that possession was sufficient notice of his deed; *Bell* v. *Twilight*, 22 N. H. 519; *Hadduck* v. *Wilmarth*, 5 N. H. 188; and in such case the title of Aldrich to this tract would have been good against the attachment and the extent.  In this view the question as to betterments would become immaterial.  The residue of the land would pass by the extent, and as the defendant's title accrued subsequently to the attachment in this case, he would be concluded by the sheriff's return to deny that the appraisers were disinterested.  *Howard* v. *Daniells*, 2 N. H. 137; *Fletcher* v. *Bank*, 37 N. H. 400; *Angier* v. *Ash*, 26 N. H. 105; *Grover* v. *Howard*, 31 Me. 548; *McKeen* v. *Gannon*, 33 Me. 187; *Rollins* v. *Moers*, 25 Me. 196.

Although there may be no practice in this State authorizing the court to set aside a verdict in part (*Knowles* v. *Dow*, 22 N. H. 388), yet here we are especially empowered to do so by the agreement of the parties, to which we see no legal objection.  *Robbins* v. *Townsend*, 20 Pick. 351.  The plaintiffs are entitled to retain their verdict for the portion of the premises conveyed by Clark after the attachment, but as to the residue, which was conveyed by him March 22, 1853, the verdict must be set aside and a

*New trial granted.*